JONES, Chief Justice,
respectfully dissenting.
¶ 24 Dr. McCarver did nothing more than evaluate Ms. Stanley’s pre-employment x-ray at the request of a prospective employer relative to an informed hiring decision. He did not see Ms. Stanley and was never approached by her for medical treatment. No physician-patient relationship existed, nor was there any particular relationship between the two. Nevertheless, the majority holds the doctor undertook a duty of care toward Ms. Stanley, the breach of which could subject the doctor to liability in tort for a medical condition that was not caused by negligence of the doctor. No legal authority is cited that would extend a duty of care in that circumstance. For reasons explained below, I would hold that imposition of a duty on the doctor in these circumstances constitutes an extension of the concept of duty that is unjustified as a matter of law.
¶ 25 In holding that Dr. McCarver should take steps reasonably calculated to apprise Ms. Stanley of her condition, the majority reasons that although no traditional physician-patient relationship existed between the parties, the doctor “placed himself in a unique position to prevent future harm to Ms. Stanley” and that “[i]n such a circumstance, an examinee reasonably expects the physician to sound the alarm if any potentially serious abnormality is discovered.” Op. ¶ 14. I disagree because I cannot agree that the doctor was uniquely placed to prevent future harm. Moreover, the personal expectations of an injured party do not involve legal determinations, but are factual matters directly related to, and thus part of, the standard of care determination to be made by the jury as the trier of fact. This principle is bolstered by the notion that expectations vary enormously, person to person, circumstance to circumstance, and thus must be found reasonable in their application, ease by ease. In contrast, duty can exist only as a matter of law. Thus, unless the duty to be imposed on a defendant can be supported by a legitimate legal source, the personal expectations of an injured plaintiff become legally irrelevant.
¶26 The majority struggles to identify a duty source, referring to such notions as the plaintiffs reliance on the doctor for diagnosis, the relationship between the defendant’s conduct and the injury sustained, the degree of certainty that the plaintiff will suffer harm, the skill or reputation of the doctor, the defendant being positioned to prevent harm, or public policy. Op. ¶ 12. In my view of the record before us, the remoteness of any connection between Ms. Stanley’s general health and Dr. McCarver’s narrow undertaking as an independent contractor to read a tuberculosis screening x-ray for employment purposes is much too attenuated to bring the case within any possible source of duty mentioned by the majority.
*227 ¶27 The majority cites Diggs v. Arizona Cardiologists, Ltd., 198 Ariz. 198, 8 P.3d 386 (App.2001). There, the court noted that the doctor, a cardiologist in the hospital emergency room at the time, was in the “unique position to prevent future harm to Mrs. Diggs.” Id. at 202, ¶ 20, 8 P.3d at 389. Still, the basis on which the doctor’s duty was found to exist was not his ability to prevent future harm, but rather, the foreseeable reliance on the doctor’s medical opinion that resulted in Mrs. Diggs’ release from the emergency room. Id. ¶22. Diggs simply stands for the logical proposition that an emergency room doctor who gives a medical opinion as the basis for the decision to release the patient or continue the treatment has assumed a duty of care to that patient.
¶28 While the Diggs rationale might be applied in other cases asserting medical malpractice, I would find it inapplicable here. Because Ms. Stanley’s x-ray was to be used solely to determine employability rather than continued treatment, Dr. McCarver could not have anticipated patient reliance as a basis for future medical treatment in the way that Mrs. Diggs relied on the emergency room doctor’s assessment of her eligibility for release from the hospital.
¶ 29 A finding of duty in the field of negligence, must rest on solid legal ground. Thus, we should not rely, in the absence of a particular relationship, on a concept as undefined as “a panoply of social concerns,” Op. ¶22, from which to draw legal notions of duty. Otherwise, endless circumstances might be imagined in which duty is found between persons without a relationship, unconnected in any meaningful way. Admittedly, numerous examples might arise in which a “moral” obligation may manifest itself, but these do not create a “legal” duty offering potential plaintiffs an opportunity to sue in tort.
¶ 30 I find no other jurisdiction that has extended the concept of duty to include a person so remotely connected to the plaintiff as is Dr. McCarver in the case at bar. Nevertheless, the majority uses language from cases that do not directly support the proposition Ms. Stanley advances to fashion the rule it adopts today.
¶ 31 Thus, today’s opinion cites cases supporting the notion that a preexisting relationship between plaintiff and defendant need not exist if public policy can mandate the imposition of a duty. See Lombardo, 199 Ariz. at 99-100, 14 P.3d at 290-91; see also Tarasoff v. Bd. of Regents, 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334 (Cal.1976). I disagree with that general proposition, but even assuming public policy, by itself, could give rise to a legal duty, the policy alleged in the instant case is not compelling. For example, in Lombardo, this court held that a buyer’s real estate agent was obliged to disclose to the seller facts critical to the buyer’s ability to perform the purchase agreement. Lombardo, 199 Ariz. at 100, ¶ 13, 14 P.3d at 291. But we noted in that case, because the buyer owed the duty, agency principles dictated that her agent had the same duty. Id.; see also Restatement (Second) of Agency § 348 cmt. e (1958) (“[I]f the agent knows that the principal does not intend to perform the contract because of hopeless insolvency or other reason, the making of a contract for him under such conditions subjects the agent to liability.”). To have held otherwise would allow a party to a contract, through an agent, to deal unfairly with all other parties to a transaction. Lombardo, 199 Ariz. at 100, ¶ 14, 14 P.3d at 291. The imprudence in that result is self-evident.
¶ 32 Similarly, the California Supreme Court in Tarasojf held that a mental health expert whose patient intended to harm a third person owed a duty of reasonable care to protect the targeted victim. 131 Cal.Rptr. 14, 551 P.2d at 340. The mental health expert was privy to vital information and therefore knew his patient was bent on taking the life of another. Policy reasons underlying Tarasojf are akin to the Arizona Rules of Professional Conduct which impose an ethical duty on lawyers to report intended criminal conduct where serious bodily injury or death is at stake. See Ariz. R. Sup.Ct. 42, ER 1.6(b). Again, recognizing the immediacy of the intentional threat to life or person, it is a simple matter to understand why sound policy imposes such a duty.
¶33 Arizona cases illustrate the need for this court to allow the legislature to define *228 the public policy of the state. In Brannigan v. Raybuck, 136 Ariz. 513, 516-17, 667 P.2d 213, 216-17 (1983), and Ontiveros v. Borak, 136 Ariz. 500, 508, 511, 667 P.2d 200, 208, 211 (1983), the issue was whether a tavern owner should be duty-bound to withhold intoxicants from a patron to prevent the patron from later injuring third parties. Brannigan, 136 Ariz. at 515-16, 667 P.2d at 215-16; Ontiveros, 136 Ariz. at 508, 511, 667 P.2d at 208, 211. Finding that such duty indeed did exist, the court recognized that its rationale at least in part turned on the existence of a statute “constituting] legislative recognition of the foreseeable danger to both the patron and third parties, and an effort to meet that danger by enactment of laws designed to regulate the industry, [and] to protect third persons.” Brannigan, 136 Ariz. at 517, 667 P.2d at 217 (emphasis added); see also Ontiveros, 136 Ariz. at 509, 667 P.2d at 209 (“Even if the existence of a tavern owner’s duty to act with care when furnishing liquor to patrons could not be found by application of common law principle and authority, its existence could be postulated upon the affirmative requirements of statute.”).
¶ 34 Conversely, while the legislature in the instant case could have subjected Dr. MeCarver to a duty similar to that imposed on tavern owners, it has not done so. Further, given the immediacy of the threat of an intoxicated person causing harm to third parties by driving drunk, the principle in favor of a duty imposed on tavern owners is by no means difficult to comprehend as a worthwhile extension of sound public policy. In the instant case, we have no declaration of policy and I perceive no similar threat of immediate harm to innocent third persons brought about by the actions of a tortfeasor.
¶ 35 On this record, I find it impossible to identify an adequate policy source to justify the imposition of a duty of care on Dr. MeCarver in favor of Ms. Stanley. We are dealing with a pre-employment x-ray screening evaluation, nothing more. There is no physician-patient or other special relationship between Ms. Stanley and Dr. MeCarver. Indeed, there was no indication in the record that Ms. Stanley could identify the doctor who would perform the evaluation. Ms. Stanley had no contact with the doctor. Even in Reed (cited by the majority), the case perhaps most supportive of the majority view, where the Supreme Court of New Jersey found that a doctor performing a preemployment screening owed a duty to a prospective employee, direct and personal contact between the prospective employee and the doctor in fact took place.[8]
¶ 36 I believe, as Dr. MeCarver argues and as the vast majority of courts would conclude, that a duty of care should not be imposed on an evaluating doctor where treatment is not involved and where there is no physician-patient or other particular relationship. See, e.g., Ramirez v. Carreras, 10 S.W.3d 757, 761 (Tex.App.2000) (physician examined employee to determine fitness to return to work following an injury; held, “when a physician examines a person for the benefit of a third party and no physician-patient relationship exists, the only duty owed by the physician is the duty not to injure the examinee”); Ney v. Axelrod, 723 A.2d 719, 721, ¶ 8 (Pa.Super.1999) (‘Where a third party has sponsored a medical examination of a person and the person later alleges negligence on the part of the physician who performed the examination, that person cannot succeed on a negligence cause of action.”) (citation omitted); Peace v. Weisman, 186 Ga.App. 697, 368 S.E.2d 319, 320 (1988) (finding no liability, in absence of a physician-patient relationship, where doctor failed to diagnose lung cancer during examination to determine patients eligibility for Social Security benefits); Keene v. Wiggins, 69 Cal. App.3d 308, 313, 138 Cal.Rptr. 3 (Cal.Ct.App.1977) (“[W]here no physician-patient relationship exists the doctors only duty is to conduct the examination in a manner not to cause harm to the person being examined. The physician acts as an agent of the person *229 requesting the examination and absent special circumstances, his duty to observe good standards of professional skill in reporting the results of the examination runs only to the person employing him.”) (citation omitted). Each of these cases indicates with ample clarity the parameters of duty on the facts of the case before us.
¶ 37 Finally, I believe that the Restatement (Second) of Torts 324A (1965), cited by the majority, is inapplicable in the instant case. That section applies to a person who undertakes to render services to another, “which he should recognize as necessary for the protection of a third person.” Id. Dr. McCarver undertook to read Ms. Stanleys x-ray solely to inform a prospective employer of Ms. Stanleys employability. Nothing in the record suggests the doctor was duty bound to “recognize” this tuberculosis screening “as necessary” for Ms. Stanleys protection.
¶ 38 For the foregoing reasons, I would vacate the opinion of the court of appeals and reinstate the trial court’s grant of summary judgment in favor of Dr. McCarver.

. It is also noteworthy that in Reed, the original lawsuit named two doctors — one who conducted Reed's physical, and a radiologist who was responsible for reading Reed’s chest x-ray. Reed, 764 A.2d at 435. The radiologist, who had no personal contact with Reed, but merely reported the results of the x-ray to a third party (the doctor performing the physical), was dismissed from the lawsuit on summary judgment. Id.